# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**BRENT BEAMS,**

                **Plaintiff,**

**-v-**

**WAL-MART STORES EAST, L.P.,**

                **Defendant.**

**Case No. 3:09-CV-096**

**Judge Thomas M. Rose**

---

## ENTRY AND ORDER GRANTING WAL-MART'S MOTION FOR SUMMARY JUDGMENT (Doc #46) AND TERMINATING THIS CASE

---

This matter comes now before the Court on Defendant Wal-Mart Stores East, L.P.'s ("Wal-Mart's") Motion for Summary Judgment. (Doc. #46.) This Motion is now fully briefed and ripe for decision.

Plaintiff Brent Beams ("Beams") complains that Wal-Mart violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17. Specifically, Beams alleges that Wal-Mart discriminated against him and terminated his employment as a pharmacist due to his religious beliefs.[1] (Compl. ¶¶ 1-3.) Beams seeks a declaratory judgment, compensatory damages, punitive damages and attorneys' fees.

Beams' Complaint was mediated on June 4, 2010. The Mediator reported that the case had settled. On June 14, 2010, Beams' attorneys moved to withdraw due to irreconcilable and

---

[1]Beams does not plead a claim for religious discrimination apart from the failure to provide an accommodation claim. Even if Beams had properly pled a claim for religious discrimination, it would fail because he cannot establish that he was replaced by a person outside of the protected class or that he was treated differently than similarly situated employees. *See Burdette v. Federal Express Corp.*, 367 Fed. App'x 628 (6th Cir. 2010).

fundamental differences over the litigation. (Doc. #36.) At the same time, Beams' attorneys filed a Motion To Stay until Beams could obtain other counsel or decide to proceed pro se. (Doc. #37.) The Motion To Withdraw was granted and Beams was given until not later than July 16, 2010, to obtain new counsel or elect to proceed pro se. Wal-Mart's Motion for Summary Judgment is now fully briefed and ripe for decision.

On July 20, 2010, Wal-Mart requested and was granted an extension of time to extend the dispositive motion filing deadline to August 6, 2010. (Doc. #39.) This Motion was granted and Wal-Mart filed their Motion for Summary Judgment on August 6, 2010. Beams has given no formal indication to the Court as to whether he elected to obtain counsel but the Response to Wal-Mart's Motion for Summary Judgment was filed pro se.

A brief factual background will first be set forth. This will be followed by the standard of review and an analysis of Wal-Mart's Motion.

## RELEVANT FACTUAL BACKGROUND

Wal-Mart hired Beams on January 28, 2004, as a Staff/Relief Pharmacist at their Store #2429 on Bechtel Avenue in Springfield, Ohio. (Compl. ¶ 15.) He remained employed in this position until his employment was terminated by Wal-Mart on February 20, 2007. (Deposition of Brent Beams ("Beams Dep.") 16 Nov. 19, 2010.)

Beams reported to Melissa Blanton ("Blanton"), the Pharmacy Manager. (Beams Dep. 57.) Blanton reported to Mike Kaiser ("Kaiser"), Wal-Mart's District Manager for Pharmacy. (Id. 96-97.) Kaiser reported to Arnie Fox ("Fox"), Wal-Mart's Regional Manager. (Id.) Fox reported to Ken Sasse ("Sasse"), Wal-Mart's Division Manager. (Id.) Sasse reported to Ron Chomiuk ("Chomiuk"), Wal-Mart's Vice President of Operations for Pharmacy. (Deposition of

Ron Chomiuk ("Chomiuk Dep.") 16 Feb. 25, 2010.)

As a Wal-Mart Associate, Beams was provided with information on Wal-Mart's policies and procedures during orientation. (Chomiuk Dep. 72.) Associates were informed of changes to Wal-Mart's policies and procedures via The Wire, Wal-Mart's intranet. (Id.) In Store #2429, when new or revised policies relative to pharmacists were posted on The Wire, Blanton would review them with the Pharmacists and Pharmacy Associates. ((Deposition of Melissa Blanton ("Blanton Dep.") 42 Feb. 18, 2010.)

Wal-Mart had Three Basic Beliefs: (1) respect for the individual; (2) service to our customers; and (3) strive for excellence. (Beams Dep. 213, Ex. 24.) Beams was aware of these beliefs. (Beams Dep. 213.)

Consistent with its Three Basic Beliefs and to ensure that customers receive their medications in a timely fashion, Wal-Mart requires its Pharmacists and Pharmacy Associates to adhere to POM 204. (Beams Dep. 102, Ex. 6.) POM 204 is more fully detailed below.

In addition to POM 204, Wal-Mart maintains a "Coaching for Improvement Policy" which outlines the disciplinary policy applicable to Wal-Mart associates. (Beams Dep. 214-16, Ex. 26.) The "Coaching for Improvement Policy" outlines a progressive disciplinary policy which begins with a verbal coaching and can result in termination, depending upon the severity of the misconduct and the prior level of coaching provided. (Id.) In certain situations, one or all of the steps may be skipped depending upon the severity of the conduct.[2] (Id.)

**Beams' Religious Beliefs**

---

[2]Wal-Mart discusses an anti harassment and discrimination policy labeled PD-19 but does not identify the evidence thereof in the record.

-3-

Beams is a Christian who believes that life begins at conception. (Beams Dep. 43.) Based upon his training to be a pharmacist, Beams believed that contraception prevented conception from occurring. (Id. 41.) In May of 1998, Beams read an article about progestin-only[3] birth control which said that this particular type of contraception did not always prevent conception. (Id.) He then went to the pharmacy shelves and obtained a Micronor insert written for physicians and pharmacists that said that, in clinical trials of Micronor, a progestin-only drug, 50% of the women ovulated. (Id. at 42.) Since then, Beams has objected to dispensing progestin-only birth controls. (Id.) Beams specifically objects to dispensing progestin-only birth controls, Cytotec[4] and Plan B. (Id. at 54.) In sum, Beams believes that a large percentage of women still ovulate while taking progestin-only birth control prescriptions, that fertilization is occurring and that the progestin-only drugs then prevent implantation in the womb thus ending a human life after conception.

Blanton was aware of Beams' religious beliefs and objection to dispensing progestin-only contraceptives. (Blanton Dep. 68-69.) The Pharmacy Technicians were also aware of Beams' belief and respected it. (Id. 171.)

Wal-Mart presents evidence that Beams filled forty-three prescriptions for Provera between January 2004 and October 2006. (Affidavit of Mike Gulas ("Gulas Aff.") Ex. 1 Aug. 5, 2010.) Wal-Mart argues that Provera is a progestin-only contraceptive. Beams does not dispute that he dispensed Provera but argues that Provera is not used for contraception. (Affidavit of

---

[3]Progestin is a synthetic with effects similar to progesterone. Progesterone is a steroid hormone involved in the female menstrual cycle.

[4]Cytotec is used to protect the stomach lining when a person is on a nonsteroidal antiinflamatory drug that can expel a fetus from the womb. (Beams Dep. 53.)

Brent Beams ("Beams Aff.") ¶ 2 Aug. 27, 2010.) An article on the website MedicineNet.com authored by Omudhome Ogbru, PharmD, says that Provera is a derivative of progestin and can prevent ovulation (release of the egg from the ovary) at high doses. This article warns that Provera inhibits fertility at high doses and should not be given during pregnancy.

## Plan B

Plan B is an emergency contraceptive (morning after) that does not fall into the general category of contraceptives. (Deposition of Ken Sasse ("Sasse Dep.") 32 Mar. 26, 2010.) Prior to 2006, Wal-Mart had not sold Plan B over-the-counter ("OTC") in any of its stores.

In August of 2006, Wal-Mart distributed a memorandum to all Pharmacy associates regarding the sale of Plan B as an OTC product. (Beams Dep. Ex. 1.) The memorandum indicated that Plan B was not to be sold OTC until the FDA approved the OTC packaging and that any media inquiries were to be directed to Wal-Mart's public relations hotline. (Id.)

Beginning around November 1, 2006, Plan B became legally available as an OTC product. (Id. Ex. 2.) Wal-Mart issued another memorandum regarding Plan B which Blanton reviewed with the Pharmacists and Pharmacy Associates at Store #2429. (Blanton Dep. 107-08.) In this memorandum, Wal-Mart notified the Pharmacy associates that Plan B could be sold only in the Pharmacy. (Id.) It would be sold to anyone 18 years of age or older without a prescription and to individuals under 18 years of age with a prescription. (Id.) Finally, the memorandum indicates that a member of DIV 01 Mgt is able to conduct the sale in the Pharmacy if needed and to refer to POM 204 for direction. (Id.) Plan B is not considered by Wal-Mart to be in its core class of drugs. (Sasse Dep. 31.)

## POM 204

The version of POM 204 in effect at the time of Beams' termination outlined Wal-Marts expectation that a pharmacist would "fill prescriptions that are written with sound medical standards and are considered core to the practice of Pharmacy (e.g. antibiotics, pain, medications, anorexics, oral contraceptives, etc.)." (Beams Dep. Ex. 6.) POM 204 also outlines the steps to be taken by pharmacists if a drug is out of stock or the Pharmacy does not carry the drug for business reasons. (Id.) In addition, POM 204 instructs the Pharmacist to respect the personal beliefs of Wal-Mart's customers and indicates that it is inappropriate to confront a customer about personal beliefs regarding the customer's decisions to take medications. (Id.) Finally, POM 204 outlines the steps to be taken if a pharmacist has a conscientious objection to dispensing drugs outside of the core classes of drugs. (Id.)

According to POM 204, if an associate has a conscientious objection to filling a prescription that is outside the core classes of drugs, the associate is to take the following steps:

> 1. Refer the prescription to another Wal-Mart Stores, Inc. Pharmacist present in the Pharmacy.
>
> 2. If another Wal-Mart Stores, Inc. Pharmacist cannot accommodate the Patient within a Company Pharmacy, refer them to another local pharmacy that carries the drug.
>
> 3. If another local pharmacy cannot be reached, assist the Customer in contacting their physician to call in the prescription to another pharmacy.

If an associate has a conscientious objection to selling a pharmacy only over-the-counter ("OTC") product, the associate is to take the following steps:

> 1. Refer the Pharmacy only OTC item sale to another Wal-Mart Stores, Inc. Pharmacy Associate present in the Pharmacy.
>
> 2. If another Wal-Mart Stores, Inc. Pharmacy Associate cannot accommodate the Patient, contact a member of Store Management to provide help for the Customer in the Pharmacy Department.

-6-

3. If another Wal-Mart Stores, Inc. Pharmacy Associate or member of Store Management cannot accommodate the Patient, refer them to another local pharmacy that carries the pharmacy only OTC item.

### Beams Refuses To Sell Plan B To a Customer

On January 8, 2007, a female customer and male companion approached a Pharmacy Technician at Store #2429 to purchase OTC Plan B. (Beams Dep. 79-80.) The Technician told Beams that the couple wanted to purchase Plan B and Beams responded that there was no one present who could dispense Plan B. (Id.) Beams did not speak to the couple and did not take any other action. (Id.) OTC Plan B was not sold to the customer. (Id.)

That same day, this couple called Store #2429's pharmacy and spoke to Beams. (Id. 84.) The female told Beams that, if she had to get an abortion, it would be his fault. (Id.) Beams responded, "I'm sorry to hear you speak like that… but I'm glad that your mother didn't make that decision." (Id.)

Later that day, the couple contacted Wal-Mart's customer hotline to complain that they were unable to purchase Plan B at Store #2429. (Deposition of Mike Kaiser ("Kaiser Dep.") 45, Ex. 15.) Wal-Mart District Manager Mike Kaiser ("Kaiser"), who also believes that life begins at conception, spoke to Beams to determine what happened during Beams' interaction with this customer. (Kaiser Dep. 28-30.) Kaiser then followed up with the customer regarding her complaint. (Id. Ex. 15.)

A few days later, Misti Crane ("Crane"), a reporter from the Columbus Dispatch, contacted Store #2429 to speak about the above incident. (Chomiuk Dep.) 74-77, Ex. 11.) Beams spoke to Crane and provided her with a statement about the incident. (Id.) Crane also contacted Wal-Mart's home office to obtain additional information related to the incident. (Id.) During

these conversations, Wal-Mart learned that Beams had spoken to Crane earlier that day without Wal-Mart's permission. (Id.)

At Kaiser's request, Beams then provided a statement to Sasse and Kaiser regarding his conversation with Crane. (Beams Dep. 90-93, Ex. 3.) In this statement, Beams said he had discussed Plan B and his failure to dispense Plan B on January 8, 2007 with Crane. (Id.) Beams was then suspended with pay while an investigation of the incident was conducted. (Id. 94.) After being suspended, Beams provided a second written statement to Sasse, Kaiser and Fox. (Id. 92, Ex. 4.) This time, Beams admitted to refusing to provide Plan B on two separate occasions. (Id.) He also admitted to arguing with and making inappropriate statements to the customer on January 8, 2007. (Id.)

Prior to the Dispatch printing an article, Wal-Mart re-circulated the November 2006 memorandum regarding OTC Plan B along with a copy of POM 204 via email. (Beams Dep. Ex. 7; Kaiser Dep. 48.) Pharmacy management was asked to review both documents with all Pharmacy Associates. (Id.)

### Beams Given Decision Making Day

Beams was given a Decision Making Day Coaching because of his failure to follow the proper procedures outlined in POM 204 in connection with the sale of Plan B, because of his rude comments to the customer on the telephone, and because he did not deal directly with the customer at the Pharmacy counter. (Kaiser Dep. 36-37, 88-89; Beams Dep. Ex. 5.) Because Beams claimed that he did not fully understand his obligations under POM 204, Wal-Mart decided not to terminate his employment and to provide him with another opportunity. (Sasse Dep. 90-91; Kaiser Dep. 31-32.)

During the coaching meeting, Kaiser specifically discussed POM 204 with Beams and how to properly make a conscientious objection to dispensing Plan B. (Beams Dep. 100-01.) During this discussion, Beams explained that, in addition to Plan B, he had also been refusing to dispense progestin-only birth control products. (Id. 97-98.)

After discussing POM 204 with Kaiser, Beams agreed to perform the requirements of POM 204, including the requirement that he fill prescriptions in Wal-Mart's core class of drugs. (Kaiser Dep. 90, 160.) Beams says he never agreed to fill progestin-only birth control pills. (Beams Dep. 97-98.) However, a few days later, Beams stated that, while he would agree to follow POM 204 with regard to Plan B, he wanted to be able to assert a conscientious objection to dispensing progestin-only birth control products. (Beams Dep. 97-98, 104, 111, 121, Ex. 5; Kaiser Dep. 160.)

Kaiser then instructed Beams that, going forward, Beams was expected to: (1) follow POM 204, including the obligation to fill prescriptions in Wal-Mart's core class; (2) provide an explanation in writing to both Kaiser and Fox if and when he objected to dispensing a prescription; and (3) refrain from speaking to the media. (Kaiser Dep. 49.)  The requirement to provide a written explanation for each refusal to dispense was requested because of Beams' failure to properly follow POM 204 in the past which had resulted in a loss of customer good will and had caused negative media exposure for Wal-Mart. (Sasse Dep. 79-80.)

**<u>Beams Continues To Not Follow POM 204 and Is Terminated</u>**

Thereafter, Beams mailed two letters to Kaiser and Fox dated January 31 and February 5, 2007. (Beams Dep. 129-33, Exs. 9 & 10.) The letters outlined two instances where Beams did not dispense an injectable form of progestin-only birth control. (Id.) In both of these situations,

-9-

Beam refused to dispense the medication and asked the customer to return later. (Id.) One of the customers returned the next day and one did not. (Id.) Beams considered these letters to be conscientious objections.

On February 15, 2007, Wal-Mart suspended Beams. On the next day, Fox called Beams at home and said he wanted to discuss the letters that Beams had sent. (Beams Dep. 143.) Beams brought up some points about the progestin-only birth control pills and their mechanism of action. (Id.) Fox then asked Beams if Beams thought Wal-Mart should made a religious exception or exemption. (Id.) Beams declined to answer. (Id.) Fox then asked if Beams wanted to be treated differently than any other Wal-Mart pharmacist and Beams said "no." (Id.) Later that day, Beams faxed a letter to Fox requesting that he be permitted to make a conscientious objection to all progestin-based contraceptives, including those in the core class of drugs. (Id. 146-47, Ex. 13.)

On February 20, 2007, Fox again spoke to Beams over the telephone. (Beams Dep. 153.) Fox read POM 204 to Beams and asked Beams if he believed that the situations on January 30 and February 4 were handled in accordance with POM 204. (Beams Dep. 157-58.) Beams admitted that they were not. (Id.) Specifically, Beams admitted that he did not offer to call another pharmacy in order for the customer to obtain her prescription and, instead, asked the customer to return at a later time. (Id.)

Fox relayed this information to Sasse who made the decision to terminate Beams' employment. (Sasse Dep. 79.) Sasse contacted Kaiser to get Kaiser's feedback on the decision to terminate Beams' employment. (Id. 129-30.) Sasse thought it important to make sure that Kaiser agreed with the decision to terminate Beams' employment since Kaiser held the same or similar

-10-

religious beliefs as Beams. (Kaiser Dep. 134-35, 168.)

Sasse decided to terminate Beams for two reasons. First, Sasse believed that Beams failed to follow POM 204 in that Beams failed to dispense injectable contraceptives that were in Wal-Mart's core class of drugs. (Sasse Dep. 132-33.) Second, Sasse believed that Beams did not follow the steps in POM 204 for asserting a conscientious objection. (Id.) Based upon Beams' statements to Fox that Beams did not want to follow a checklist with a customer, Sasse believed that Beams clearly understood the steps under POM 204 but intentionally decided to not follow them. (Id. 153.) Accordingly, on February 20, 2007, Beams' employment was involuntarily terminated for "Misconduct w/Coachings." (Beams Dep. Ex. 15.)

After his termination, Beams telephoned Sasse, pursuant to Wal-Mart's open-door policy, for reconsideration of the termination decision. (Beams Dep. 168-73.) Sasse would not reconsider the decision. (Id.)

On February 22, 2007, Beams spoke with Chomiuk, pursuant to Wal-Mart's open-door policy, for reconsideration of the termination decision. (Chomiuk Dep. 14-16.) Beams was told by Chomiuk that if Beams did not fill all prescriptions in the core class, Beams could not work for Wal-Mart. (Beams Dep. 175.)  Chomiuk also supported the decision to terminate Beams' employment. (Id. 178.)

Later in the afternoon of February 22, 2007, Beams spoke with Bill Simon ("Simon"), Wal-Mart's Director of Professional Services. (Beams Dep. 179.) Simon listened to Beams' explanations and said he would check into the matter and have someone get back with Beams. (Id.)

In the morning of February 23, 2007, Sasse called Beams and told Beams his

employment had been terminated because he did not fill a prescription in Wal-Mart's core class

of drugs and that Beams "broke policy." (Id. 184-86.) Sasse also said that Beams had a right to a

conscientious objection outside the core class of drugs but Beams did not follow POM 204. (Id.)

On March 28, 2007, Beams contacted Wal-Mart's Human Resources Department and

spoke with Joyce Bartley ("Bartley") concerning the errors on his COBRA enrollment form.

(Sasse Dep. 24, Ex. 27.) Beams shared with Bartley that he believed he was unjustly terminated

and she said Beams should speak to Ann LaRue ("LaRue"), the Senior Director of Human

Resources. (Beams Dep. 198-99.) LaRue then called Beams and asked him to write a time line of

the events, which he did and sent it to LaRue. (Id. 199-201.) LaRue read the time line but then

told Beams that his situation had already been fully investigated and there was nothing she could

do. (Id.) This lawsuit was then filed on March 10, 2009.

### Accommodation

The Pharmacy at Store #2429 is open from 9:00 a.m. until 9:00 p.m. on Monday through

Friday, 9:00 a.m. until 7:00 p.m. on Saturday and 9:00 a.m. until 5:00 p.m. on Sunday. (Beams

Dep. 58.) Store #2429 fills approximately 250 prescriptions per day, approximately 2.5% of

which are related to requests for progestin-only birth control (Kaiser Dep. 149; Gulas Aff. Ex.

1.)

Wal-Mart's pharmacies are staffed based upon the number of prescriptions filled per day.

(Blanton Dep. 22-24, 27-28; Beams Dep. 57-58.) The more prescriptions filled, the more

Pharmacists are assigned. (Id.) Based upon its volume, Store #2429's Pharmacy had two

Pharmacists assigned, Beams and Blanton. (Id.) Beams and Blanton were regularly scheduled to

cover the Pharmacy hours of operation. (Id.) A third Pharmacist would be assigned on an as-

needed basis. (Id.)

There were many occasions where either Beams or Blanton worked a twelve-hour shift to cover the hours of operation for the entire day. (Id.) If neither Beams nor Blanton worked a twelve-hour shift, the Store #2429 Pharmacy was staffed by having both Beams and Blanton work opposite shifts with a short overlap in the middle. (Id.) Thus, Beams would have been the only Pharmacist on duty during certain periods.

An option would have been to transfer Beams to another Wal-Mart pharmacy. However, there were no Pharmacist positions available in January or February of 2007 in a Wal-Mart store in Ohio that would have had enough payroll hours to support scheduling two pharmacists during all of the pharmacy's hours of operation. (Second Affidavit of Ken Sasse ("Sasse 2d Aff.") ¶ 7 Sept. 13, 2010.)

Further, even if there would have been an open position, Beams was not eligible to transfer because of his active Decision Making Day Coaching, which he received in January of 2007. Under Wal-Mart's applicable Associate Transfer Policy, to be eligible for a job transfer, an associate must have (1) been in his or her current position for at least six months, (2) have a current evaluation rating of "Meets Expectations" or above, and (3) have no active Written Coaching or Decision Making Day. (Sasse 2d Aff. Ex. 1.)

## RELEVANT LEGAL PROVISIONS

### Motions for Summary Judgment

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

-14-

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, §2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not …obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

### Discrimination On the Basis of Religion

"Title VII of the Civil Rights Act of 1964, as amended in 1972, makes it unlawful for an employer to discriminate against an employee on the basis of religion." *Virts v. Consolidated*

-15-

*Freightways Corp. of Delaware*, 285 F.3d 508, 516 (6th cir. 2002)(citing 42 U.S.C. § 2000e-2(a)(1)). The employer must accommodate the religious belief or practice or demonstrate that it is unable to reasonably do so. *Ansonia Board of Education v. Philbrook*, 479 U.S. 60, 68 (1986).

Only religious beliefs that are sincerely held are protected. *United States v. Seeger*, 380 U.S. 163, 185 (1965); *International Society for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 441(2d Cir. 1981). A religious belief is not sincerely held if the holder acts in a manner inconsistent with the belief. *Barber*, 650 F.2d at 441.

The analysis begins with whether an employee has established a prima facie case of religious discrimination. *Virts*, 285 F.3d at 516. If a prima facie case is established, the burden shifts to the defendant to show that it could not reasonably accommodate the employee without undue hardship. *Id.*

To establish a prima facie case, a plaintiff must show that: (1) he or she holds a sincere religious belief that conflicts with an employment requirement; (2) he or she has informed the employer about the conflict; and (3) he or she was discharged or disciplined for failing to comply with the conflicting employment requirement. *Id.*

The reasonableness of an employer's attempt to accommodate is determined on a case-by-case basis. *Id.*(citing *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378 (6th Cir. 1994)). To begin with, a failure to request accommodations is fatal to a claim of religious discrimination. *Id.* at 518. Further, to require an employer to bear more than a *de minimis* cost to accommodate an employee's religious beliefs is an undue hardship. *Id.* at 516. An undue hardship would also be placed on the employer if the proposed accommodation would force changes in the schedules of other employees and alter the employer's otherwise neutral procedure. *Trans World Airlines,*

-16-

*Inc. v. Hardison*, 432 U.S. 63, 81 (1977). Finally, an employer can prove undue hardship without actually having undertaken any of the possible accommodations. *Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir. 1975).

## ANALYSIS

Beams alleges that Wal-Mart discriminated against him on the basis of his religion. Specifically, he alleges that Wal-Mart discriminated against him because he believes that a large percentage of women still ovulate while taking progestin-only birth control prescriptions, that fertilization is occurring and that the progestin-only drugs prevent implantation in the womb thus ending a human life after conception.

Wal-Mart responds that Beams cannot show a prima facie case of failure to accommodate because his belief is not sincerely held. Wal-Mart also argues that all possible accommodations would have resulted in an undue burden.

Thus, there are two issues to be addressed. The first is whether Beams religious belief is sincerely held. The second is whether all possible accommodations would have resulted in an undue burden on Wal-Mart.

### **Sincerely Held Belief**

Wal-Mart argues that Beams' religious belief is not sincerely held because he has dispensed Provera which Wal-Mart argues is a progestin-only drug that can be used as a contraceptive. Beams responds by stating that Provera is not used for birth control.

Provera's generic name is "medroxyprogesterone acetate." *Provera* (Sept. 30, 2010 10:19 a.m.), http://www.drugs.com/pdr/provera.html; Omudhome Ogbru, *Medications and Drugs - medroxyprogesterone acetate* (Sept. 30, 2010 10:20 a.m.),

-17-

http://medicinenet.com/medroxyprogesterone/rticle.htm. Medroxyprogesterone is derived from the female hormone progesterone. *Id.*

Medroxyprogesterone is used to treat conditions such as absent or irregular menstrual periods, or abnormal uterine bleeding. *Medroxyprogesterone* (Sept. 30, 2010 10:19 a.m.) http://www.drugs.com/medroxyprogesterone.html. At high doses, progestins can prevent ovulation and thereby prevent pregnancy. Omudhome Ogbru, *supra*. Further, forms of medroxyprogesterone are used as a contraceptive injection and prescribed in the treatment of endometrial cancer.

Thus, Provera is a progestin-only drug. Further, while not normally used for birth control, at high doses, Provera can prevent ovulation. However, Beams' objection is not to drugs that prevent ovulation, his objection is to drugs that prevent a fertilized egg from being implanted in the womb. There is no evidence that Provera prevents a fertilized egg from being implanted in the womb.

Thus, at best, there is a genuine issue of material fact as to whether Provera prevents implantation in the womb and thus can end a human life after conception. Wal-Mart is not entitled to summary judgment on the basis that Beams does not have a sincerely-held religious belief.

**Accommodation**

Wal-Mart argues that all possible accommodations would have placed an undue burden on it. Beams agrees that Wal-Mart did not have to schedule another pharmacist to work with him so its customers could be adequately served and that Wal-Mart should not have to endure any negative publicity and loss of customer good will by permitting him to have his religious based

objection.

Beams states that the accommodation provided by Blanton worked out well for about three years until after the unfortunate OTC Plan B incident on January 8, 2007. However, the record does not indicate that Beams offered an accommodation after January 8, 2007, until briefing on Wal-Mart's Motion for Summary Judgment. Therein, Beams argues that Wal-Mart could have transferred him to a busier store where two pharmacists are regularly scheduled along with changing its POM 204 conscientious objection policy.

First, the only accommodation that Beams indicated that he considered acceptable at the time was one that allowed him to simply turn customers away and ask them to return later to pick up their prescriptions. However, Beams has now conceded that this would have resulted in an undue burden on Wal-Mart.

Second, allowing Beams an exception to POM 204 or changing POM 204 would be an undue hardship on Wal-Mart. Specifically such an exemption or change would result in asking customers to return at a later date and/or time and would result in an undue burden in the form of poor customer service, lost sales and lost customer good will. *See Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126 (1st Cir. 2004)(creating an exemption that would adversely affect the employer's image would be an undue hardship), *cert. denied*, 545 U.S. 1131 (2005).

Wal-Mart has provided evidence that all possible accommodations would have resulted in an undue hardship and Beams has not presented evidence to the contrary. Beams was, at times, the only pharmacist on duty at Store #2429. Thus, to accommodate Beams' religious beliefs, Wal-Mart would have needed to either rearrange the schedule to have another pharmacist work with Beams at all times or allow Beams to refuse to dispense all progestin-only

contraceptives being used as contraceptives. The former would result in hiring an additional pharmacist, an undue burden on Wal-Mart. The latter would result in customers being delayed in receiving their prescriptions, negative publicity and loss of sales and good will, all undue burdens on Wal-Mart.

The only evidence to the contrary identified by Beams is his after-the-fact proposal that he be transferred to another store. However, Beams' after-the-fact proposal would have created an undue burden on Wal-Mart because there were no pharmacist positions available in the relevant time frame and, if there were, Beams was not eligible to transfer because he had an active Written Coaching or Decision Making Day. *See Hardison*, 432 U.S. at 81 (a proposed accommodation that would force changes in the schedules of other employees or alter the employer's otherwise neutral procedure is an undue burden).

Wal-Mart has presented evidence that all possible accommodations would cause an undue hardship on it and Beams has not identified evidence to the contrary. Therefore, Wal-Mart is entitled to summary judgment on this issue.

## CONCLUSION

There is a genuine issue of material fact as to whether Beams can show a prima facie case of religious discrimination. There is evidence that Beams informed Wal-Mart about his conflict and that he was discharged for failing to comply with the conflicting employment requirement. However, there are genuine issues of material fact as to whether Beams' religious belief was sincerely held because there are genuine issues of material fact as to whether Provera prevents implantation of a fertilized egg in the womb and thus can end a human life after conception.

However, Wal-Mart can avoid a successful religious discrimination claim by showing

that  it could not reasonably accommodate Beams' religious belief without undue hardship. This Wal-Mart has done. Therefore, Wal-Mart is entitled to summary judgment on Beams' religious discrimination claim.

Because the religious discrimination claim is the only claim brought by Beams, his Complaint must be dismissed. The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio this Seventh Day of October, 2010.

**s/Thomas M. Rose**

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record